

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| AB REALTY ONE, LLC, | ) | No. ED101457 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | |
| | ) | Honorable Dale W. Hood |
| MIKEN TECHNOLOGIES, INC., | ) | |
| | ) | Filed: July 31, 2015 |
| Defendant/Appellant. | ) | |

## INTRODUCTION

Miken Technologies, Inc. ("Miken") appeals the judgment of the trial court in favor of

AB Realty One, LLC ("AB Realty") on AB Realty's petition for breach of a lease agreement.

Miken argues the trial court misapplied the law in determining that it breached the lease for the

2011 and 2012 terms by failing to pay common area utilities and other maintenance expenses.

Miken also argues there is no substantial evidence to support the court's factual findings and

award of damages. We affirm in part, reverse in part, and remand for further findings consistent

with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The dispute in this case involves Miken's purported obligation to pay common area

utilities and maintenance expenses in a warehouse facility in which it leased space in 2011 and

2012. On December 19, 2008, Miken executed a commercial lease for a tenancy running the whole of 2009 (the "2009 Lease"). During the 2009 Lease period, AB Realty purchased the facility housing the premises leased by Miken, and assumed the landlord's obligations and rights under the 2009 Lease.

Pursuant to the 2009 Lease, Miken agreed to lease 3,185 square feet of warehouse office space in a facility with a total leasable area of 18,000 square feet. Miken agreed to pay "Base Rent" for the year, in monthly installments of $1,857.02. Miken also agreed to pay "Services and Utilities" defined as "all water, gas, heat, light, power, telephone, sewer, and other utilities and services" used on the premises it leased within the warehouse facility.

In addition to the above rent and utilities, Miken agreed to pay a fee denominated "Additional Rent" that would be "calculated and billed quarterly for Common Area Maintenance Operating Expenses" ("CAM"). The 2009 Lease defined CAM as "all expenses, actual or accrued, in connection with the ownership, management and operation of the [warehouse office]." It categorized these expenses as follows:

> 1. Cost of all maintenance and service agreements on equipment, including without limitations fire protection systems maintenance, exterminators, snow removal, [and] rubbish removal.

> 2. Insurance premiums.

> 3. Cost of repairs and general maintenance of the [warehouse office], including, without limitation, its common areas, landscaping, parking lots and the grounds surrounding the [warehouse office], but exclusive also of expenditures made for capital investments, and Leasing commissions.

> 4. Cost of all utilities, including water, sewer and energy for lighting of the Common areas of the Buildings.

The provision defining CAM further stated: "[t]he obligation of [Miken] with respect to the payment of Additional Rent [CAM] shall survive the termination of this Lease."

2

Miken's share of CAM payments in the 2009 Lease was based on its proportionate share of the facility's total leasable area, which was calculated to be 17.69%. In other words, because Miken leased 17.69% of the total leasable area within the warehouse facility, or 3,185 square feet of the warehouse's 18,000 square feet, Miken was obligated to pay 17.69% of the total CAM. The lease provided that any future increase in Miken's proportionate share of CAM must also be based upon Miken's proportionate share of the facility's total leasable area, "determined in accordance with the American Standard of Floor Measurement of the Buildings Owners' and Managers' Association (BOMA)."

The 2009 Lease also included an attorney's fees provision that stated, in relevant part: "the non-prevailing party shall [bear] the sole cost of all reasonable legal fees." There was also a provision entitling AB Realty to a "Late Payment Charge . . . . at the rate of (5%) per month for Rent not paid when due." It also contained a "No Waiver" provision stating: "[t]he fact that [AB Realty] does not exercise its rights hereunder in the event of breach . . . by Tenant shall not be deemed a waiver of such rights as to subsequent breaches."

After the 2009 Lease expired, Miken continued its tenancy pursuant to the terms of a one-page lease addendum, for a period running until December 31, 2010 (the "2010 Addendum"). The 2010 Addendum reduced Miken's rental obligation to $1,300 per month. It also provided Miken "will not pay for CAMM [sic] during this lease but will continue to pay for utilities." Aside from these changes, the 2010 Addendum stated it would "become a part of the original [2009] [L]ease dated December 19, 2008 . . . ."

In 2011, after the 2010 Addendum expired, the parties did not enter into any written arrangements for the lease of space within the warehouse facility. Miken, however, continued to

3

occupy space within the facility throughout 2011, and paid the same amount of rent to AB Realty as that agreed to in the 2010 Addendum.

In February 2012, the parties executed a second addendum (the "2012 Addendum") which would "become a part of the original lease dated December 19, 2008." The 2012 Addendum "extended" the lease term "on a month to month basis . . ." at the same rate of rent established in the 2010 Addendum, however it did not include any language addressing CAM or utilities. Instead, the 2012 Addendum added a notice requirement for "early termination" of the lease, and stated, "[a]ll other terms and conditions of lease shall remain in effect."

At the end of 2012, Miken terminated its tenancy with AB Realty and vacated the premises. Two months later, in February 2013, Gus Botonis, the principal shareholder of AB Realty, sent a letter to Miken demanding payment of $5,795.15 for Miken's "pro-rata share" of CAM for the year 2011.[1] A week later, Botonis sent a second letter demanding Miken pay $3,826.62 for Miken's share of CAM "for the period January to November 15, 2012."[2] Both letters purported to calculate Miken's pro-rata share of CAM at 30.49% of the facility's total CAM. When Miken refused to pay, AB Realty filed the instant action.

In its petition, AB Realty claimed, inter alia, that Miken breached the lease in 2011 and 2012 by refusing to pay its proportionate share of CAM "as allocated under said lease and its addendums thereto." AB Realty requested the trial court award it damages, a late payment charge calculated at 5% of the damage award, and attorney's fees. Miken filed an answer denying AB Realty's claims, and the court conducted an evidentiary trial on the matter.

---

[1] AB Realty's letter demanding payment for 2011 CAM declared Miken's pro-rata share of CAM to "total" $5,795.15, and stated an additional charge for "insurance" at $1,571.97, for a demand totaling $7,367.12.
[2] AB Realty's letter demanding payment for 2012 CAM declared Miken's pro-rata share of CAM to "total" $3,826.62, and stated an additional charge for "insurance" at $2,103.95, for a demand totaling $5,930.57.

4

During trial, AB Realty submitted into evidence the 2009 Lease, the 2010 and 2012 lease addenda, an attorney's invoice[3], and bills documenting total CAM expenses for the facility during the relevant time periods. Botonis also testified in support of AB Realty's claims.

Botonis confirmed that after the 2009 Lease expired, the parties agreed to extend Miken's tenancy another year under the 2010 Addendum. Botonis testified the 2010 Addendum was prepared by his secretary, and the parties intended its terms to relieve Miken of the obligation to pay CAM. He further testified as follows:

[GUS BOTONIS]: We – We just went this [sic] agreement here which just to kind of help him out that one time but that, if I recall, it didn't include utilities.

[PLAINTIFF'S COUNSEL]: Okay. And it says here that they were going to still pay for utilities?

[GUS BOTONIS]: Yes.

[PLAINTIFF'S COUNSEL]: Is that correct?

[GUS BOTONIS]: Correct. He would use them.

Next, Botonis confirmed that in 2011, the parties did not enter into a written agreement or addendum for the leased premises, and AB Realty continued to accept rent from Miken. He could not recall the very first time that he billed Miken for 2011 CAM, but confirmed that AB Realty did not bill Miken quarterly or semi-annually in 2011. Botonis confirmed that in 2012, Miken and AB Realty executed the 2012 Addendum, which was also prepared by his secretary. He could not recall whether there was any discussion concerning CAM payments for 2012.

On cross-examination, Botonis testified regarding AB Realty's square footage calculations for 2011 and 2012. He confirmed the demand letters requested CAM payments "based upon 30.49 percent" of the total leasable area. Botonis then testified as follows:

---

[3] The attorney's fees invoice itemized services totaling $2,857.50. At the conclusion of the evidence, Miken's trial counsel orally "stipulated" to "admitting" this invoice into evidence.

[DEFENSE COUNSEL]: Now, how much space was Miken . . . leasing at that time?

[GUS BOTONIS]: I honestly can't remember all the square footage of all the tenants.

THE COURT: I can't hear you, sir.

[GUS BOTONIS]: I honestly can't remember all the square footage of all the tenants I had. I've got over 300 tenants. I just – I can't remember everybody's.

[DEFENSE COUNSEL]: Well, I understand that, but you're making a claim based upon him having 30.49 percent of 18,000 square feet.

[GUS BOTONIS]: Okay.

[DEFENSE COUNSEL]: All right. Did he occupy that much? Did he occupy 5,400 square feet?

[GUS BOTONIS]: That might – He may have. I think it's all in the ballpark. I mean, I know he had one – one space alone that he had was 2,500 square feet and then he had another one that's over 2,000, so that's probably about the ballpark.

At the close of AB Realty's case in chief, Miken called its Chief Executive Officer, Michael Smith, to testify in its defense. Smith testified that after the 2009 Lease expired, Miken negotiated a new lease rate with AB Realty that included no CAM fees, as reflected in the 2010 Addendum. Although the 2010 Addendum provided that Miken agreed to pay "utilities," Smith testified the parties intended this to mean only that Miken would pay the utilities it used on the space leased; not the utilities within the definition of CAM. He testified Miken would not have continued its lease in 2010 if the parties intended Miken to pay any CAM.

Smith testified that the parties did not enter into a written agreement for 2011. Instead, in December 2010, there were discussions between Miken and AB Realty "just to renew and continue on." He testified these discussions did not include Miken paying CAM, and that the terms and conditions for 2011 were not meant to include CAM. He further testified that he first learned that AB Realty was seeking CAM for 2011 in its February 2013 demand letter.

6

Regarding Miken's obligation to pay CAM in 2012, Smith testified that in 2012, he and Botonis had "some discussions regarding rent," but "reinstitution" of CAM was never mentioned. He testified that, similar to the 2010 arrangement, if there had been any discussion concerning CAM payments for 2012, Miken would have "moved out" and ended its tenancy.

Smith confirmed that during the 2011 and 2012 lease periods the amount of spaced leased by Miken increased, because Miken agreed to move some of its office to a different part of the facility to "accommodate Botonis," who had a tenant "that wanted three contiguous spaces . . . ." In exchange, Botonis agreed to give Miken "a larger space for the same rent." Smith could not remember exactly how much space it occupied in 2011 and 2012, however he confirmed that Miken did not occupy 30.49%, or 5,400 square feet of the facility, rather he believed it "was around 3,100 square feet . . . ."

The court entered final judgment in favor of AB Realty on its claim for breach of the 2011 and 2012 leases. The court found that Miken breached the lease in 2011 "by not paying utilities due and owing . . . ." The court found that Miken breached the 2012 lease "by not paying CAM costs, including utilities and insurance, due and owing." The court awarded AB Realty the sum of $7,282.47 in damages resulting from both breaches. As a result of Miken's purported breaches of the lease terms for 2011 and 2012, the court also found that AB Realty incurred late fees of $4,477.48 and reasonable attorney's fees of $2,857.50, for a total judgment in favor of AB Realty of $14,617.45.

Miken timely filed a motion to reconsider or in the alternative a motion for new trial, which the trial court denied without issuing further findings of fact. Miken now appeals. During the pendency of this appeal, AB Realty filed a pending motion for attorney's fees incurred on appeal.

7

## STANDARD OF REVIEW

In a bench-tried case, the trial court's judgment will be sustained unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or misapplies the law. Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). On appeal, "[t]his Court applies de novo review to questions of law decided in court-tried cases." Pearson v. Koster, 367 S.W.3d 36, 43 (Mo. banc 2006). This means we review "the trial court's determination independently, without deference to that court's conclusions." Id. at 43-44 (quoting Moore v. Bi-State Dev. Agency, 132 S.W.3d 241, 242 (Mo. banc 2004)). In reviewing questions of fact, however, we defer to the trial court's assessment of the evidence if any facts relevant to an issue are contested. Id. at 44. The trial court receives deference on factual issues, because it is in a better position to judge the credibility of the witnesses, including their sincerity, character, and other trial intangibles which may not be completely revealed by the record. Id.

The interpretation of a lease agreement is a question of law that we review de novo. Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475, 479 (Mo. App. W.D. 2002); Central Stone Co. v. Warning, 412 S.W.3d 908, 913 (Mo. App. E.D. 2013). When reviewing whether the court's judgment is supported by substantial evidence, we view the facts in the light most favorable to the judgment, deferring to the trial court as the finder of fact. Business Men's Assur. Co. of Am. v. Graham, 984 S.W.2d 501, 506 (Mo. banc 1999); Ivie v. Smith, 439 S.W.3d 189, 200 (Mo. banc 2014).

8

DISCUSSION

I.      Point One: Breach of the Lease in 2011 and 2012

In its first point, Miken argues the trial court misstated and misapplied the law in construing the terms of the lease for the periods 2011 and 2012.[4] Specifically, Miken argues the lease terms for 2011 and 2012 were ambiguous and, in light of this ambiguity, should have been construed against AB Realty as the drafter, and resolved in favor of Miken, because there was no substantial evidence submitted at trial to support the court's findings in favor of AB Realty. AB Realty answers that no ambiguity existed, because the applicable lease terms in 2011 and 2012 clearly required Miken to pay CAM.

We agree with Miken that the court misapplied the law in finding Miken breached the lease for the 2011 term by failing to pay CAM "utilities." However, the court did not err in construing the terms of the 2012 lease to require Miken to pay CAM.

The threshold issue presented by Miken is whether there was an ambiguity in the terms governing the 2011 and 2012 lease periods. If an ambiguity existed, then we must consider extrinsic evidence to determine whether the substantial evidence presented at trial supported the court's findings and judgment in favor of AB Realty.[5] J.E. Hathman, Inc. v. Sigma Alpha

---

[4] Miken's point on appeal is multifarious, and violates Rule 84.04(d) because it presents multiple legal issues that should be stated in two separate points. Klinkerfuss v. Cronin, 289 S.W.3d 607, 613 (Mo. App. E.D. 2009). The point challenges the trial court's finding and award of damages for the 2011 lease term, based on a lease and lease addendum that applies only to 2011, as well as the substantial extrinsic evidence submitted at trial in support of that finding. The point also challenges the court's finding and award of damages for the 2012 lease period, based on a separate lease addendum and additional extrinsic evidence. While improper points relied on generally preserve nothing for appellate review, AB Realty was able to ascertain Miken's arguments and respond in its brief. Therefore we review Miken's claims ex gratia to provide a determination on the merits. See Johnson v. Mo. Dept. of Health & Senior Serv.'s, 174 S.W.3d 568, 586 (Mo. App. W.D. 2005); Barnett v. Rogers, 400 S.W.3d 38, 47 (Mo. App. S.D. 2013).

[5] We note that neither party requested findings of fact or conclusions of law, and the trial court's judgment provided no explanation as to whether it determined the parties' intent based on the plain language of the lease, or whether it considered extrinsic evidence in reaching its determinations. Therefore, in the absence of express findings, we view the contested facts as having been found in accordance with the judgment, and presume the court knows the law. Herron v. Barnard, 390 S.W.3d 901, 910 (Mo. App. E.D. 2013).

9

Epsilon Club, 491 S.W.2d 261, 264 (Mo. banc 1973). Furthermore, because the 2011 and 2012 lease periods are governed by two separate addendums, we must analyze the language used in these addendums separately for resolution of Point I.

Missouri courts interpret a lease according to the rules of construction governing contracts. Homar Enterprises, inc. v. Daake, 957 S.W.2d 353, 359 (Mo. App. E.D. 1997). The primary rule of contract interpretation is to determine the parties' intent and give effect to that intent. ATC Co. v. Myatt, 389 S.W.3d 732, 735 (Mo. App. E.D. 2013). When another instrument is incorporated by reference, the original instrument and the incorporated document must be construed together as the final agreement. Wilson Mfg. Co. v. Fusco, 258 S.W.3d 841, 845 (Mo. App. E.D. 2008). If the contract is not ambiguous, the intent of the parties is determined by giving the terms used in the contract their plain, ordinary, and usual meaning. Id. Only when the language is ambiguous and not clear will we resort to extrinsic evidence to resolve a contractual ambiguity. J.E. Hathman, Inc., 491 S.W.2d at 264.

Whether a contract is ambiguous is a question of law. Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc., 171 S.W.3d 70, 73 (Mo. App. E.D. 2005). An ambiguity exists when, in the context of the entire agreement, the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." Id. An ambiguity arises when there is uncertainty in the meaning of the words used in the contract. Baker-Smith Sheet Metal, Inc. v. Building Erection Services Co., 49 S.W.3d 712 (Mo. App. W.D. 2001). The ambiguity must come from within the four corners of the contract; extrinsic evidence cannot be used to create an ambiguity. ATC Co. v. Myatt, 389 S.W.3d 732, 735 (Mo. App. E.D. 2013).

A. The 2011 Lease Term

Miken argues the terms and conditions for the 2011 lease period were ambiguous, and based on extrinsic evidence adduced at trial the court should have construed this ambiguity in favor of Miken. The parties agree that the terms and conditions governing Miken's 2011 tenancy are set forth in the 2010 Addendum. "[W]here a tenant holds over, after the expiration of the term provided for in the tenant's lease, with the consent of the landlord, a new tenancy arises to which the provisions of the expired lease are applicable." Grand Invest. v. Connaughton, Boyd & Kenter, 119 S.W.3d 101, 107 (Mo. App. W.D. 2003); See also Brittany Sobery Family Ltd. P'ship v. Coinmach Corp., 392 S.W.3d 46, 49 (Mo. App. E.D. 2013). Thus, the 2010 Addendum affects the rights and obligations of the parties for the 2011 lease period.

Here, the 2010 Addendum incorporates the 2009 Lease, stating it will "become a part of the original lease dated December 19, 2008 . . . ." However, the 2010 Addendum also amends Miken's rental obligation, reducing it, and states: "[Miken] will not pay for CAMM [sic] during this lease but will continue to pay for utilities [sic]." It provides, however, that: "[a]ll other terms and conditions of lease shall remain in effect."

Miken asserts that the 2010 Addendum, when construed together with the 2009 Lease, is ambiguous, because it references "utilities" without clarifying which utilities Miken must pay. Miken further asserts that the court should have construed this ambiguity against AB Realty, as the drafter of the 2010 Addendum. AB Realty responds that the term "utilities" is not ambiguous, and the terms of the 2010 Addendum clearly obligated Miken to pay CAM "utilities" in 2010, as well as during the 2011 lease period. We agree with Miken that the term "utilities," used in the 2010 Addendum, is ambiguous.

11

Here, a plain reading of the 2010 Addendum provides that Miken is not required to pay CAM expenses, yet must still pay for utilities according to the terms of the 2009 Lease. The 2009 Lease, however, provides for two different categories of utilities, one that is specified as a CAM expense, and another that is unrelated to CAM. Specifically, section 6.B. of the 2009 Lease obligates Miken to pay a portion of CAM defined as the: "[c]ost of all utilities, including water, sewer and energy for lighting of the Common areas of the Buildings." Alternatively, section 10, identifies a separate category of utilities unrelated to CAM, and provides:

> [Miken] shall pay for all water, gas, heat, light, power, telephone, sewer, and other utilities and services used on or from the Leased Premises (water and sewer billed through CAM quarterly), including without limitation, Tenant's Share of any central station signaling system installed in the Leased Premises or the Buildings . . . .

While there are two categories of "utilities" in the 2009 Lease, one that is included within CAM and one that is not, the 2010 Addendum makes no distinction between these categories. Without additional clarification, the term "utilities" as used in the 2010 Addendum could reasonably be interpreted to mean the parties intended to exempt Miken from paying all CAM expenses, except for CAM utilities, or the parties intended to exempt Miken from paying all CAM expenses, including CAM "utilities." Because the term "utilities" as used in the 2010 Addendum is reasonably susceptible to two different meanings, we agree with Miken that this term creates an ambiguity that must be resolved using extrinsic evidence.

Because the language at issue in the 2010 Addendum is ambiguous, we will consider this language in the context of the entire contract as well as parol evidence to determine the intent of the parties, "including the practical construction the parties themselves have placed on the contract by their acts and deeds, and external circumstances." Brittany Sobery Family Ltd. P'ship, 392 S.W.3d at 50. "Ambiguities should only be construed against the drafter when other

12

means of construction fail and the intent of the parties cannot be ascertained from other sources." Eveland v. Eveland, 156 S.W.3d 366, 369 (Mo. App. E.D. 2004).

Miken argues that, when the extrinsic evidence is considered, there is no substantial evidence to support the trial court's determination that Miken breached the lease for the 2011 term by failing to pay CAM "utilities." We agree.

"Substantial evidence" has been defined as "competent evidence which, if believed, would have probative force on the issues." Gamble v. Hoffman, 732 S.W.2d 890, 893 (Mo. banc 1987). It is "evidence from which the triers [sic] of fact reasonably could find the issue in harmony therewith." City of K.C. v. Oxley, 579 S.W.2d 113, 115 (Mo. banc 1979) (quoting State v. Gregory, 96 S.W.2d 47, 51-52 (1936)). Here, other than the ambiguous language found in the 2010 Addendum, AB Realty fails to identify any evidence, and our own review of the record reveals no evidence from which the court could reasonably find the parties intended Miken to pay CAM "utilities" in 2011. Instead, the evidence in the record supports only one conclusion, that the parties did not intend Miken to pay CAM "utilities" for the 2011 lease period.

During trial, Botonis testified that the parties intended Miken to pay "utilities" under the 2010 Addendum. Without any further explanation or clarification, this testimony lacks any probative force because it does not clarify the ambiguity previously identified by showing the parties intended this to include CAM "utilities." Conversely, Smith, the CEO of Miken, testified that he never submitted any payment of CAM "utilities" to AB Realty during the 2010 or the 2011 lease periods, because he did not understand the lease terms to require such payments. Furthermore, the conduct of the parties demonstrates they did not intend for Miken to pay any CAM "utilities" in 2011. The uncontroverted evidence establishes that AB Realty did not make any demand for CAM "utility" payments during the 2011 lease period, despite the terms set forth

13

in the 2009 Lease stating that such expenses, if owed, would be "calculated and billed quarterly for Common Area Maintenance Operating Expenses," ("CAM"). Instead, AB Realty waited over a year after the 2011 lease period ended and Miken vacated the premises, before demanding 2011 CAM.[6] Even when viewed in the light most favorable to the judgment, we find no substantial evidence in the record to support the court's finding that the parties intended that Miken would be obligated for CAM "utilities" in 2011, and the court erred in finding otherwise.

### B. The 2012 Lease Term

Miken also argues the language of the 2012 Addendum was ambiguous, and the trial court should have considered additional extrinsic evidence and found the parties did not intend for Miken to pay CAM in 2012. AB Realty responds that no ambiguity exists in the 2012 Addendum, therefore the court did not err in finding Miken breached the terms of the 2012 lease by failing to pay CAM expenses to AB Realty. We agree with AB Realty.

Similar to the 2010 Addendum, the 2012 Addendum also incorporates the 2009 Lease, stating it will "become a part of the original lease dated December 19, 2008." The 2012 Addendum further provides: "[t]he term of the lease is extended on a month to month basis . . . at the yearly rent of Fifteen Thousand Six Hundred and 00/100 ($15,600.00) dollars, payable monthly in advance . . . ." However, unlike the 2010 Addendum, the 2012 Addendum does not reference CAM payments, or utilities, and aside from an early termination provision, it states: "[a]ll other terms and conditions of lease shall remain in effect."

Miken argues that the 2012 Addendum is ambiguous because it references "extending" the terms and conditions of "a lease." Therefore, Miken claims, an ambiguity arises concerning which lease's terms and conditions were "extended."

---

[6] While the court awarded AB Realty compensation for 2011 CAM "utilities," AB Realty's February 2013 demand letter requested compensation for all CAM expenses incurred in 2011.

14

AB Realty correctly observes, however, that when a contract references another instrument, the language of that instrument becomes a part of the agreement only to the extent specified by the reference. Wilson Mfg. Co., 258 S.W.3d at 845. Thus, here, because the 2012 Addendum incorporates the terms of the 2009 Lease, we construe the reference to extending "the lease" to mean the parties intended to extend only the 2009 Lease. See Wilson Mfg. Co., 258 S.W.3d at 846 ("A reference by the contracting parties to an extraneous contract for a particular purpose makes it a part of their agreement only for the purpose specified.") Consequently, the terms of the 2012 Addendum, together with the 2009 Lease, specifically and clearly require Miken to pay its proportionate share of such common area expenses, and the trial court did not err in finding Miken breached the 2012 lease by failing to pay CAM.

Nevertheless, the trial court erred in awarding AB Realty damages on its claim for breach of the 2011 lease period. As a result, AB Realty is no longer the prevailing party on one of its two primary claims that Miken breached the lease for the 2011 and 2012 terms. AB Realty was not entitled to an award of reasonable attorney's fees with respect to its claim that Miken breached the lease in 2011. The entire fee, therefore, must be recalculated by the trial court. See Ken Cucchi Const., Inc. v. O'Keefe, 973 S.W.2d 520, 529 (Mo. App. E.D. 1998) (finding plaintiff is not entitled to attorney's fees as prevailing party if it fails on the main issue in dispute). Furthermore, the court's calculation of late fees must also be recalculated to reflect the reduction in the award of damages that follows from this Court's holding.

We therefore reverse the trial court's award of damages with respect to the 2011 lease period, and direct the trial court to enter judgment in favor of Miken on AB Realty's claim that Miken breached the lease in 2011. However, we affirm the court's finding that Miken breached the lease in 2012. Point one is granted in part.

II.     Point Two: Damages

In their second point, Miken argues the court erred in awarding damages for unpaid CAM based upon its finding that Miken occupied 30.49% of the square footage of the total leasable area of the warehouse facility. Specifically, Miken argues there is no substantial evidence to support this finding, therefore the court's award of CAM is not supported by substantial evidence. AB Realty argues the substantial evidence established that Miken's pro rata share of the leased space increased during the 2011 and 2012 lease periods, therefore the trial court "was able [to] draw [the] inference" that Miken occupied 30.49% of the total leasable area within the facility. We agree with Miken.

In an action for breach of a lease, the plaintiff must prove damages resulted from that breach "with reasonable certainty." TA Realty Assoc.'s Fund V, L.P. v. NCNB 1500, Inc., 144 S.W.3d 343, 347 (Mo. App. E.D. 2004). However, the amount of damages awarded is a matter of fact for the trial court to determine, and is, therefore, entitled to great weight and will generally not be disturbed on appeal "unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive." The Manors at Vill. Green Condo., Inc. v. Webb, 341 S.W.3d 162, 164-65 (Mo. App. E.D. 2011).

Proof of actual damages must rise to the level of substantial evidence, which has been defined as "that which a reasonable mind would accept as sufficient to support a particular conclusion, granting all reasonable inference[s] which can be drawn from it." Catroppa v. Metal Bldg. Supply, Inc., 267 S.W.3d 812, 817 (Mo. App. S.D. 2008) (quoting Jones v. Mo. Hwy. & Transp. Comm'n, 878 S.W.2d 521, 523 (Mo. App. S.D. 1994)). "'Stated otherwise, proof of actual facts which present a basis for a rational estimate of damages without resorting to

16

speculation is required.'" <u>Manley v. Meyer</u>, 386 S.W.3d 772, 776 (Mo. App. S.D. 2011) (quoting <u>Rissler v. Heinzler</u>, 316 S.W.3d 533, 536–37 (Mo. App. W.D. 2010)).

Here, the 2009 Lease expressly states Miken's proportionate share of the leased premises is 17.69% of the facility's total leasable area. The 2009 Lease further requires "any increase" to Miken's proportionate share of the leased premises "*shall bear* to the total rentable area of the [warehouse facility], determined in accordance with the American Standard of Floor Measurement of the Buildings Owners' and Managers' Association (BOMA)." (emphasis added).

Other than the demand letter, AB Realty offered no evidence that Miken occupied 30.49% of the square footage of the total leasable area of the warehouse facility. During trial, AB Realty adduced evidence and testimony that Miken's proportionate share of the leased premises increased during the 2011 and 2012 lease periods, however, Botonis could not definitively recall the exact amount of square footage leased, stating only that Miken leased one space that was 2,500 square feet and then another one "over 2,000 square feet . . ." and that 30.49% was "in the ballpark." This testimony, however, even when viewed in the light most favorable to the judgment, establishes only that Miken increased its proportionate share to 25% of the total square feet of the facility.

Indeed, AB Realty concedes in its brief that the evidence at trial does not support its specific claim that Miken occupied 30.49% of the facility's total leasable area. AB Realty argues, however, that the evidence shows that Miken increased its proportionate share of the total leasable area, therefore "the Trial Court Judge was able [to] draw [the] inference . . ." that Miken leased 30.49% of the total leasable area. However, "[a] mere conjecture . . ." based on an

17

inference, "does not make substantial evidence." <u>Pandijiris v. Oliver Caddillac Co.</u>, 98 S.W.2d 969, 977 (Mo. 1936).

Furthermore, neither the demand letter nor Botonis's testimony establishes that Miken's "increased" proportionate share of the total leasable area was "determined in accordance with the American Standard of Floor Measurement of the Buildings Owners' and Managers' Association (BOMA)." Therefore, we agree with Miken that AB Realty failed to meet its burden to prove Miken occupied 30.49% of the total square footage of the warehouse facility's leasable area.

Accordingly, the trial court erred in finding Miken liable for 30.49% of the total CAM expenses for 2012. However, because the 2009 Lease specifically identified Miken's proportionate share of the leased premises to be 17.69% of the total leasable area, there remains substantial evidence for the court to find Miken's proportionate share of CAM to be 17.69%. We therefore reverse the trial court's award of damages for Miken's breach of the 2012 lease, and remand with instructions that the court recalculate CAM expenses to reflect Miken's pro-rata share of CAM to be 17.69% of the total CAM. We also instruct the court to reduce its assessment of late fees in a manner consistent with this opinion. Point granted.[7]

## CONCLUSION

With respect to the 2011 lease term, we reverse the trial court's judgment finding that Miken breached the lease and its award of damages on this claim. We remand with instructions that the court enter judgment in favor of Miken, and recalculate its total award of attorney's fees and late fees in light of this Court's holding.

With respect to the 2012 lease term, we affirm the court's judgment finding that Miken breached the 2012 lease. However we reverse its award of damages and remand with instructions

---

[7] In light of our determination, we do not find AB Realty to be the prevailing party on this appeal. Therefore, its motion for attorney's fees taken with the case on appeal is denied.

18

that the trial court recalculate the 2012 CAM award. Additionally, the court's calculation of late fees with respect to the 2012 lease must also be recalculated to reflect the reduction in the award that will necessarily follow from this Court's holding.

_____
Lisa S. Van Amburg, Chief Judge

Lawrence E. Mooney, P.J. and
Clifford H. Ahrens, J. concur.